IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

———————————————————

BOS GMBH & CO. KG and BOS
AUTOMOTIVE PRODUCTS, INC.,

Plaintiff,                                          Case No.: 4:17-cv-10461
                                                    Hon. Terrence G. Berg

v

MACAUTO USA, INC., and MACAUTO
INDUSTRIAL CO., LTD.,

            Defendants.

———————————————————

## **<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Fed. R. Civ. P. 56, Defendants, Macuato USA, Inc., and Macauto Industrial Co., Ltd., through its counsel, Cardelli Lanfear, P.C., respectfully move for summary judgment in this matter.

For the reasons stated in the attached Brief in Support, there is no genuine issue of material fact that Defendants did not infringe Claims 22, 23, 24, 29, 32, 37, 38, and 42 of the '659 patent, and there is no genuine issue of material fact that Claims 22, 23, 24, 29, 32, 37, 38, and 42 of the '659 patent are invalid.

Concurrence was sought from Plaintiffs' counsel on April 2, 2020, and was denied.

CARDELLI LANFEAR, P.C.

By: /s/ Jason T. Newman
    Jason T. Newman (P72571)
    CARDELLI LANFEAR, P.C.
    Attorney for Defendants
    322 W. Lincoln, Royal Oak, MI 48067
    (248) 544-1100
Dated: April 3, 2020    jnewman@cardellilaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

_____

BOS GMBH & CO. KG and BOS
AUTOMOTIVE PRODUCTS, INC.,

Plaintiff,                                              Case No.: 4:17-cv-10461
                                                        Hon. Terrence G. Berg

v

MACAUTO USA, INC., and MACAUTO
INDUSTRIAL CO., LTD.,

            Defendants.

_____

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED...................................................iv

CONTROLLING OR MOST APPROPRIATE AUTHORITY ...............................v

STATEMENT OF MATERIAL FACTS ..................................................1

ARGUMENT .........................................................................6

   DEFENDANTS DID NOT LITERALLY INFRINGE CLAIMS
   22, 23, 24, 29, 32, 37, 38, 42 OF THE '659 PATENT ........................6

   DEFENDANTS DID NOT INFRINGE
   CLAIMS 22, 23, 24, 29, 32, 37, 38, 42
   OF THE '659 PATENT
   UNDER THE DOCTRINE OF EQUIVALENTS.............................12

THERE IS CLEAR AND CONVINCING EVIDENCE
THAT THE '659 PATENT IS INVALID .............................................19

CONCLUSION......................................................................25

INDEX OF EXHIBITS.............................................................27

## STATEMENT OF ISSUES PRESENTED

1. WHETHER THIS HONORABLE COURT SHOULD ISSUE AN ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT DEFENDANTS DID NOT INFRINGE CLAIMS 22, 23, 24, 29, 32, 37, 38, AND 42 OF THE '659 PATENT?

   **DEFENDANTS STATE:** **YES.**

   **PLAINTIFFS STATES:** **NO.**

   **THE COURT SHOULD ANSWER:** **YES.**

2. WHETHER THIS HONORABLE COURT SHOULD ISSUE AN ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT CLAIMS 22, 23, 24, 29, 32, 37, 38, AND 42 OF THE '659 PATENT ARE INVALID?

   **DEFENDANTS STATE:** **YES.**

   **PLAINTIFFS STATES:** **NO.**

   **THE COURT SHOULD ANSWER:** **YES.**

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Cases**

*Continental Paper Bag Co v. Eastern Paper Bag Co.*, 210 U.S. 405 (1908).........14

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966)...............................19

*Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605 (1950) ........... 13-14

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007)

*Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) ....................................19

*AquaTex Indus. v. Techniche Solutions*, 479 F.3d 1320 (Fed. Cir.  2007)..............15

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251 (Fed. Cir. 1989)....................................................................................................................16

*Crown Packaging Tech, Inc. v. Rexam Bev. Can Co.*, 559 F.3d 1308 (Fed. Cir. 2009)....................................................................................................................16

*In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006)......................................................... 19-20

*Ironworks Patents LLC v. Samsung Elecs. Co.*, 2020 U.S. App. LEXIS 5269 (Fed. Cir. February 21, 2020) ...................................................... 21-22

*State Indus v. AO Smith Corp*, 751 F.2d 1226 (Fed. Cir. 1985) ............................13

*Teledyne McCormick Selph v. United States*, 558 F.2d 1000 (Court of Claims, 1977)......................................................................................................................6

*Trebro Mfg.  v. FireFly Equip., LLC*, 748 F.3d 1159 (Fed. Cir. 2014)....................7

*Voda v. Cordis Corp.*, 536 F.3d 1311 (Fed. Cir. 2008) ..........................................15

*Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546 (Fed. Cir. 1989)........6

*Wallace London & Clemco Prod v. Carson Pirie Scott & Co*, 946 F.2d 1534 (Fed. Cir. 1991)..............................................................................................................13

*Wyers v. Master Lock Co.*, 616 F.3d 1231 (Fed. Cir. 2010).............................. 19-20

**Statutes**

35 U.S.C. §103 ...........................................................................................20

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56 .........................................................................................6

## <u>STATEMENT OF MATERIAL FACTS</u>

### <u>Background</u>

1.      Plaintiffs' filed this lawsuit alleging infringement of U.S. Patent No. 7,188,659 ("the '659 Patent") (Exhibit A).

2.      The abstract of the '659 Patent describes it as "[a] window shade arrangement for motor vehicles that includes plastic injection molded guide rails designed such that they may be formed with injection tools that do not require movable cores for forming guide grooves therein." *Id*.

3.      Plaintiffs allege that Defendants sell a window shade arrangement for motor vehicles that infringes the '659 Patent. This product is referred to as the "Accused Products." (Exhibit B, Rebuttal Expert Report of Dr. Robert A. Malloy with Exhibit A and G, only, p. 12).

4.      Drawings of the guide rails of the Accused Products show that they are made in two parts. (Exhibit C). Diagrams of the two full guiderails and a cut-out of the accused grooves in each part are set forth below:



 

5.    Specifically, Plaintiffs allege that Claims 22, 23, 24, 29, 32, 37, 38, and 42 of the '659 Patent are infringed "the Asserted Claims." (Exhibit D, at p. 3).

6.    The two main claims at issue as to infringement are Independent Claims 22 and 37. (*Id.*, *generally*, at p. 6, 14, and 24).

7.    Claim 22 states as follows:

A guide rail arrangement (16) for window shades (14) in motor vehicles comprising an [sic] first part (63) in the form of an elongated molded part, said first part (63) including a first connecting portion (68) and an elongated section formed with a groove that is essentially free of undercuts and extends continuously over at least a part of the length of the guide rail arrangement, a second part (64) in the form of an elongated molded part, said second part (64) having a second connecting portion (71) and an elongated section formed with a groove that is essentially free of undercuts and extends continuously over at least a part of the length of said guide rail arrangement (16); and said connecting parts (68, 71) of said first and second parts (63, 64) being interconnectable to position and retain the first and second parts (63, 64) relative to one another with said grooves of said first and second parts (63, 64) defining an undercut guide groove. [Exhibit A].

8.  Claim 37 states as follows:

A window shade (14) for motor vehicles comprising a rotatably supported window shade shaft (19), a strip-shaped shade (15) having one edge fixed to said window shade shaft (19), a guide (23, 24) connected to an edge (22) of the window shade strip (15) distant from said window shade shaft (19), at least one guide rail (16) for receiving and guiding one end of said window shade guide (23, 24) for relative

2

movement, and said guide rail (16)  including a first part (63) in the form of an elongated molded part having a first connecting portion (68) and an elongated section formed with a groove that is essentially free of undercuts and extends continuously over at least a part of the length of said guide rail arrangement, a second part (64) in the form of an elongated molded part that includes a second connecting portion (71) and a [sic] elongated section formed with a groove that is essentially free of undercuts and extends continuously over at least a part of the length of the guide rail arrangement, and said connecting portions (68, 71) of said first and second parts (63, 64) being interconnectable to hold the longitudinal sections of the first and second parts (63, 64) together such that the grooves therein forming a guide groove (27) for said window shade guide (23, 24). [*Id.*].

## **Alleged Infringement**

### **Alleged Literal Infringement**

9.      Both Claim 22 and Claim 37 require that the first *and second parts* contain a groove. (Exhibit A).

10.      The Court has construed the term "groove" to be a long, narrow cut, channel or depression." (Docket No. 43).

11.      The Asserted Products do not literally infringe the '659 Patent because second part does not contain a groove as construed by the Court. (Docket No. 43, p.17); (Exhibit B, Rebuttal Expert Report of Dr. Robert A. Malloy, p. 3, 11, 12-21); (Exhibit D, Dep. of Dr. Malloy, p. 3, 11, 12-21); (Exhibit E, US Publication No. 2002/0074824 A1, reference number 74 and Figure 7); (Exhibit F, Dep of D. Parker, p. 48-49).

**Doctrine of Equivalents**

12.     Both Claim 22 and Claim 37 require two parts with grooves to be connected together to either be defining (Claim 22) or forming (Claim 37) an undercut guide groove (Claim 22) or a guide groove (Claim 37). (Exhibit A).

13.     By using a groove in each part, there is a physical, geometrical limitation or requirement of the claim that requires both the first and second parts to each form part of the groove and the undercut portion (or slot portion or steadying portion) of the undercut guide groove (Claim 22) or the guide groove (Claim 37). (Exhibit B, p. 15-21) (Exhibit D, p. 79, 83, 96-98) (Docket No. 36, Plaintiffs' Claim Construction Brief, p. 5).

14.     In the Accused Products, one part forms the groove and a separate part forms the undercut portion (or slot portion or steadying portion). (Exhibit B, p. 15-21); (Exhibit C); (Exhibit D, p. 96-98).

15.     A person of ordinary skill in the art would recognize the second part in the Accused Products as being functionally different and not being equivalent because it would allow for an exact color match on both sides of the slot and the ability to hold tighter tolerances on the width of the guide groove and the width of the slot. (Exhibit B, p. 15-21) (Exhibit D, p. 96-98 and 105-107).

**Invalidity**

16.     In addition to this litigation, there are matters pending between Macauto entities and BOS GmbH & Co KG in the China National Intellectual Property Administration ("China proceeding") and in the Federal Patent Court in German ("German proceeding").

17.     Recent decisions from the China proceeding and the German proceeding are attached as Exhibits G and H, respectively.

18.     The patent at issue in the China proceeding is Chinese patent, CN 101172457 B. (Exhibit I, with translation).

19.     The patent in the Chinese proceeding and the '659 patent disclose the same invention, their claims differ in only insubstantial ways and disclosure the same set of figures. (Exhibit J, Report of J. Leone, p. 9-13); (Exhibit K, Dep. of J. Leone, p. 59, 63-65).

20.     The patent at issue in the German proceeding is that patent to which the '659 Patent claims priority. (Exhibit A). Figures 1 and 2 of both the German patent and the '659 Patent are identical and contain identical reference numerals. (Exhibit L, with translation). Figure 3 in the German patent is identical and contains the same reference numerals as Figure 4 of the '659 Patent. *Id*. Figure 4 in the German patent is identical and contains the same reference numerals as Figure 5 of the '659 Patent. *Id*. Figure 5 in the German patent is identical and contains nearly the same reference numerals as

Figure 6 of the '659 Patent with the German patent containing an additional reference to element 68 and reference numeral 65 in place of 64. *Id.*

21.     Moreover, the following claims in the German patent and the '659 Patent, respectively, contain the same reference numerals: 1 and 22; 2 and 23; 3 and 24; 8 and 29; 10 and 32; 11 and 37; 12 and 10, and 32 and 42. (Exhibits A and L).

22.     Those proceedings found almost identical claims to the '659 Patent to be obvious to a person of skill in the art, and therefore, invalid. (Exhibits G and H, which reference to Exhibits E, N, O, P, and Q); (Exhibit M, Affidavit of R. Hsiao).

## **ARGUMENT**[1]

## I.     **DEFENDANTS DID NOT LITERALLY INFRINGE CLAIMS 22, 23, 24, 29, 32, 37, 38, 42 OF THE '659 PATENT**

Although, Plaintiffs claim that eight claims of the '659 Patent are infringed, only the independent claims 22 and 37 are relevant to this analysis. If an independent claim is not infringed, there can be no infringement of any corresponding dependent claims. *See, e.g., Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1553 and note 9 (Fed. Cir. 1989); from page 1553: "It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed." *See also Teledyne McCormick Selph v. United States*, 558 F.2d 1000, 1004 (Court of Claims, 1977):

---

[1] As set forth in Section F of the Court's Motion Practice Guidelines, the Court is obviously familiar with the standard of review for summary judgment motions under Fed. R. Civ. P. 56. Defendants will not repeat same here.

One may infringe an independent claim and not infringe a claim dependent on that claim. The reverse is not true. One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim.

"To prove an accused product literally infringes the patent in suit, the product must contain each and every limitation of the asserted claim(s)." *Trebro Mfg. v. FireFly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014). Here, both Claim 22 and Claim 37 require that the first *and second parts* contain a groove. As will be explained, the Accused Products only contain a groove in one of the parts. The Court defined the term "groove" to be a long, narrow, cut, channel or depression. Docket No. 43. All three of the descriptions requires more than having two side walls when viewed in cross section as it is anticipated that Plaintiffs' will allege either expressly or implicitly. While the Court did not adopt the specific language proposed by Defendants that would require a groove to *per se* have a "bottom," the three descriptions provided by the Court, "cut," "channel," or "depression" all require, if not specifically a "bottom," some sort of minimum structural point, or a base, or connecting structure between the side walls for it to function as a groove.

In the Court's claim construction ruling, the Court adopted the dictionary definition portions of the parties respective proposed construction. (Docket No. 43, p. 20). In its claim construction brief Defendants proposed a definition for channel as a "channel" is defined as "a long gutter, groove, or furrow." (Docket No. 37, p. 9). To give further context of the ordinary meaning of the words used to describe a

7

channel, Defendants offered the definitions of a "gutter" as "a trough along the eaves to catch and carry off rainwater" or "a trough or groove to catch and direct something," and a "furrow" as "a trench in the earth made by a plow" or "something that resembles the track of a plow: such as (a) a marked narrow depression; (b) a deep wrinkle." (*Id.*). Moreover, tellingly, in the Court's claim construction ruling it noted that BOS provided a dictionary definition for a "groove" as "a long, narrow cut or depression *in* a hard material." (Docket No. 43, p. 17) (emphasis added). The use of the term "in" and not "through" is an important limitation in the application of the term "cut," especially, in light of the inclusion of the terms "channel" and "depression" with the term "cut" in the Court's claim construction.

This can also be seen in a prior patent application that was filed in the same art class B60J as the '659 Patent by a common inventor, Herbert Walter, to the '659 Patent. That patent application has US Publication No. 2002/0074824 A1 ("Schlecht") (Exhibit D). That patent application describes reference number 74 as being "*several cuts.*" (*Id.*, emphasis added). The relevant portion of Figure 7 shows those cuts as follows:



Clearly the cuts described in that patent application are "in" a material and not "through" material. Thus, a cut must have, if not specifically a "bottom," some sort of minimum structural point, or a base, or connecting structure between the side walls for it to function as a groove.

This is further supported by the expert testimony in this matter. Defendants' expert, Dr. Malloy, a Ph.D. in Polymer Science, gave testimony as follows:

> A POSITA would understand that a "groove" is a feature having at least two sides and a bottom or base or connecting structure, which is illustrated in … Fig. 6.137:



Figure 6.137. A number of possible joint designs commonly used for injection molded plastic parts.

> A slot is an elongated feature having at least two sides and no base or bottom or connecting structure in the case of a through slot, which is illustrated in … Fig. 2.95[2]:



Figure 2.95. Whenever possible, part features such as holes or cantilever snap beams should be "designed for ejection". For example, changing a hole in a part sidewall to a slot will eliminate the tooling costs and maintenance problems associated with side action.

---

[2] It is anticipated that Plaintiffs will attempt to characterize Fig. 2.95 as depicting a groove and not a slot; however, Dr. Malloy explained the difference in his testimony:

> Q. What is it about the orientation of the part that makes the structure to the right of the hole in Figure 2.95 a slot and not a groove?
> A. I mean normally it's, you know, potentially aspect ratio. Normally a slot is longer than it is wide. A groove, you know, typically doesn't have the sort of depth that a slot would have. In this particular case the direction that you would look at the wall when you look vertically down it appears to be a groove, but from the side it's a slot. [Exhibit D, p. 51].

9

These depictions of "grooves" and "slots" where disclosed long before the priority date of the '659 Patent. Thus, however worded, a "groove" would need to have a base or connecting structure[3] to hold the second part together. The groove definition above is consistent with that of the Court. The Court's definition of "groove" does not explicitly state that a groove must have a bottom, base, or connection structure, but that is certainly implied. A "channel" for example, such as a fluid channel would need a base to contain the fluid. A "depression" in a molded part is typically a reduced thickness feature that is only partially through a wall thickness[4]. [Exhibit B, p. 12-13].

In fact, Defendants' position is further supported by the testimony of Plaintiff's expert, Mr. Parker. Mr. Parker gave the following example of a cut:

Q.· ·And can you describe in this photograph on 27 how – how that has the features of a cut?

A.· ·Sure.· As an example, if I were to take a piece of plywood and cut it with a radial saw of some sort, the blade, it would be very much like that. [Exhibit F, p. 47].

Mr. Parker was asked follow-up questions regarding this example of a cut:

*Q.· ·And if you cut the board completely in half, would you then have two pieces each with a cut?*

---

[3] It is anticipated that Plaintiffs may attempt to argue that the "bridge" feature on Defendants second part is a connecting structure. However, Dr. Malloy testified as follows:

> So I would say this is a connecting structure, which is why I used that word "bridge" because I feel like it's something different. It's not located at what would be the bottom of a groove. So as you said, this part has vertical sidewalls. If it was a groove the base would connect the top of those vertical sidewalls. [Exhibit D, p. 139-140].

[4] It is anticipated that Plaintiffs will attempt to use four references that refer to "an angular groove which is open at the bottom," an "open bottom channel," "an open bottom groove," and an "open bottom V-shaped slot or groove." However, none of those references are in the injection molding or automotive part field. All of those references have to specifically add a modifier that the particular structure in "open bottom" or "open at the bottom."
Dr. Malloy testified that an open-bottom groove and an open-bottom channel are not known in the field of injection molding of plastic parts. (Exhibit D, p. 54, 56, 62).

*A.· ·No, you'd have – at that moment, you'd have two pieces of wood, although if you somehow assembled them back together again, you could wind up with that cut, yes.* [*Id.*, p. 48-49].

So clearly if the cut is completely through something it is not a cut.

The Court construed an "undercut guide groove" to be "a guide groove which includes an indentation or overhanging portion that, if the guide groove was formed in a single molded part using a simple two-part mold, would make ejecting the single molded part from the simple two-part mold almost impossible without the single molded part being able to widen and spring back into shape." (Docket No. 43, p. 30). The parties agreed that a "guide groove" is "[a] groove that directs or steadies the motion of something."

In claims 22 and 37 we have two parts each with an "elongated section formed with a groove that is essentially free of undercuts" which are, in claim 22, connected "with said grooves of said first and second parts (63, 64) defining an undercut guide groove," and, in claim 37, connected "together such that the grooves therein forming a guide groove (27)." So, the portion of the part that we are concerned with relative to the groove is the part that is "defining an undercut guide groove" or "forming a guide groove (27)."

In the long, narrow direction that is forming either the "undercut guide groove" or "a guide groove (27)" of the Accused Products the portion alleged to be

the "cut" is completely through the part. The end wall in the Accused Products is not part of the "undercut guide groove" or "a guide groove (27)."

Unfortunately, Mr. Parker's testimony is based on a cross-sectional view in which he is incorporating the end wall into his analysis. To determine the groove feature, it needs to be viewed in the section that is "essentially free of undercuts," or the "long, narrow" section as described by the Court, because those features in both parts are what make the guide groove or undercut guide groove. Clearly the two side walls are completely separate in the second part of the Accused Products. Thus, it is not a "groove" as defined by the Court.

In the long, narrow direction there is no "cut" as there is complete separation of the side walls. This can be seen in the illustrations below:



Thus, the Accused Products do not literally infringe the '659 Patent.

## II.   DEFENDANTS DID NOT INFRINGE CLAIMS 22, 23, 24, 29, 32, 37, 38, 42 OF THE '659 PATENT UNDER THE DOCTRINE OF EQUIVALENTS

Before discussing the substance of the doctrine of equivalence, it is important to understand the background of the doctrine of equivalents. "One of the benefits of a patent system is its so-called 'negative incentive' to 'design around' a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace." *State Indus v. AO Smith Corp*, 751 F.2d 1226, 1236 (Fed. Cir. 1985). As the Federal Circuit has described:

> Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose. Competitors will never know whether their actions infringe a granted patent.

*Wallace London & Clemco Prod v. Carson Pirie Scott & Co*, 946 F.2d 1534, 1538 (Fed. Cir. 1991)

In terms of the general application, the Supreme Court has stated:

> What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given

13

to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

*Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 609 (1950).

Moreover, the Supreme Court noted that the range of application of the doctrine of equivalents varies with whether the patent is a pioneer patent or whether it is an improvement on the work of others:

The right view is expressed in *Miller v. Eagle Manufacturing Company*, 151 U.S. 186, 207, as follows: 'The range of equivalents depends upon the extent and nature of the invention. If the invention is broad and primary in its character, the range of equivalents will be correspondingly broad, under the liberal construction which the courts give to such inventions.' And this was what was decided in *Kokomo Fence Machine Case, supra, Cimiotti Unhairing Company v. American Fur Refining Company, supra*, and *Computing Scale Company v. Automatic Scale Company*, 204 U.S. 609. It is from the second of those cases, as we have seen, that the citation is made which petitioner contends the point of law upon which infringement depends is formulated; but it was said in that case: 'It is well settled that a greater degree of liberality and a wider range of equivalents are permitted where the patent is of a pioneer character than when the invention is simply an improvement, may be the last and successful step, in the art theretofore partially developed by other inventors in the same field.'

*Continental Paper Bag Co v. Eastern Paper Bag Co.*, 210 U.S. 405, 414-15 (1908).

Here, the '659 Patent is not the first patent for window shades using guide rails (*see* Exhibit E) and it's also not the first patent for make a plastic part in two pieces (*see* Exhibit O and P).

14

The primary test for equivalence is the function-way-result test, which provides that "an element in the accused device is equivalent to a claim limitation if it performs substantially the same function in substantially the same way to obtain substantially the same result." *Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008).

The Federal Circuit in *AquaTex Indus. v. Techniche Solutions*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) stated "[b]oth the Supreme Court and this court have made clear that the evidence of equivalents must be from the perspective of someone skilled in the art …."

The claim language of Claim 22, in pertinent part, is set forth below:

> … said second part *(64)* having a second connecting portion (71) and an elongated section formed with a <u>groove</u> … with *said groove<u>s</u> of said first and second parts (63, 64) defining an undercut guide groove.* [emphasis added].

The claim language of Claim 37, in pertinent part, is set forth below:

> … and said connecting portions (68, 71) *of said first and second parts (63, 64) being interconnectable to hold* the longitudinal sections of the first and second parts (63, 64) *together* such that the *groove<u>s</u>* therein *<u>forming</u>* a guide groove (27) for said window shade guide (23, 24). [*Id.*; emphasis added].

"'Element' may be used to mean a single limitation, but it has also been used to mean a series of limitations which, taken together, make up a component of the claimed invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed. Cir. 1989). A claim element can have multiple functions. *See*

*generally Crown Packaging Tech, Inc. v. Rexam Bev. Can Co.*, 559 F.3d 1308, 1315 (Fed. Cir. 2009) (analyzing argument that annular reinforcing bead performs multiple functions).

Both Claim 22 and Claim 37 require two parts with grooves to be connected together to either be defining (Claim 22) or forming (Claim 37) an undercut guide groove (Claim 22) or a guide groove (Claim 37). By using a groove in each part, there is a physical, geometrical limitation or requirement of the claim that requires both the first and second parts to each form part of the groove and the undercut portion (or slot portion or steadying portion) of the undercut guide groove (Claim 22) or the guide groove (Claim 37). This is based on simple principles of injection molding. An example was shown in Plaintiffs' Claim Construction Brief (Docket No. 36):



Further examples are illustrated below:



In the Accused Products, one part forms the groove and a separate part forms the undercut portion (or slot portion or steadying portion). The advantage is a set of guide rails for a window shade in a motor vehicle that has the ability to be used with only one piece being visible or not requiring an additional step to cover up one of both pieces of the guiderail arrangement.

Dr. Malloy discussed this in this deposition:

Q. Okay. And I'm not sure I got down what you viewed as the way for the second part element of Claim 22 for purposes of application of that test.
 What did you view as the way that the second part element of Claim 22 performs that function?

A. The undercut – well, the guide groove without any undercut, so the second part – in other words, you know, it's confusing because the term "groove" is used in three different contexts here, but the groove associated with the second part that doesn't have undercuts combines with the first part to produce the undercut guide groove.

17

Q. So the way would be to have a groove without undercuts that combines with the first part to produce the undercut guide groove; is that correct?

A. Yes.

Q. And what is the result – well, let me rephrase that.
 What I had down from your earlier testimony was you viewed the result to be when connected to the first part it allows for the guide element to travel through the guide groove; is that accurate?

A. I think that's part of the result.

Q. What's –

A. But I think – I had said that if you have a first part not having an undercut groove and the second part not having an undercut groove then the result is an assembly with both parts being visible. So, for example, there are embodiments in the '659 patent that don't use undercut guide grooves that have only one part visible, but by having two parts, each not having an undercut, the net result is the assembly must have two parts visible. [Exhibit D, p. 96-98].

Dr. Malloy also described it as follows:

Q. So in the context of the function-way-result test that you applied, what did you consider to be the function of the second part?

A. So I see the fact that only one of the Macauto parts is visible compared to two parts visible in the '659 patent is a significant difference in result, you know, and it happens because of the way they did it, because they use a slot and not two undercut grooves. There's no way they could use two undercut grooves with two parts and have both parts not be visible, or one of the two parts not visible. [Exhibit D, p. 79].
…
And the most significant difference, you know, in terms of not meeting the claim itself is the fact that one of the two parts contains a slot itself as opposed to the groove, so. [Exhibit C, p. 83].

18

Dr. Malloy also testified regarding the differences (and, in fact, advantages) of the design of the Accused Products:

> So one result would be that because only one part is visible then the color of the two sections of the second part on either side of the slot would be exactly the same. I think that's important since the patent uses the words exactly the same when they talk about how the appearance of their two-part could exactly match the color of the interior liner. So I disagree with the statement, but in this case there's no question this is an exact match on both sides of the slot. I can expand upon that if you want or if you ask – I mean, that's one result. There are others.

> Q. All right. I'm interested in what results you considered for purposes of your
> function-way-result test, so if there are more then please tell me.

> So the color being one, and the second one is the ability to hold tighter tolerances on the width of the guide groove and the width of the slot in terms of tolerances, uniformity, things of that nature. So I think in the '659 patent, I counted seven times where they discuss how the two-part design with the two parts that have no undercuts could open in some – to some degree to a very catastrophic degree or to minor degrees, but to some degree, and this Macauto part is really locked once it's assembled. No such opening could occur. I see that as a very significant result difference. [Exhibit D, p. 105-107].

## III.  THERE IS CLEAR AND CONVINCING EVIDENCE THAT THE '659 PATENT IS INVALID

A patent is presumed valid and the party asserting invalidity must prove such invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). The legal determination of obviousness may include recourse to

logic, judgment, and common sense, in lieu of expert testimony. *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239 (Fed. Cir. 2010).

35 U.S.C. §103, states in pertinent part, that "[a] patent … may not be obtained … if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious … to a person having ordinary skill in the art to which the claimed invention pertains." The test for whether a patent is obvious in light of the prior art, the Supreme Court in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966) stated as follows:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

To follow the direction in *Graham*, the Federal Circuit developed what is referred to as the teaching, motivation, or suggestion test. The Federal Circuit has explained the test as follows:

> A suggestion, teaching, or motivation to combine the relevant prior art teachings does not have to be found explicitly in the prior art, as the teaching, motivation, or suggestion may be implicit from the prior art as a whole, rather than expressly stated in the references.... The test for an implicit showing is what the combined teachings, knowledge of one of ordinary skill in the art, and the nature of the problem to be solved as a whole would have suggested to those of ordinary skill in the art.

*In re Kahn*, 441 F.3d 977, 987-88 (Fed. Cir. 2006) (quoting *In re Kotzab*, 217 F.3d 1365, 1370 (Fed. Cir. 2000)). The Supreme Court in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) modified the teaching, motivation, or suggestion test and stated as follows:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, *a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.* [emphasis added].

In this case we have testimony from Dr. Malloy and Mr. Parker regarding the level of skill of a person skilled in the art. We have two patent courts evaluating two patents in the same patent family as the '659 Patent. Mr. Leone compared the '659 Patent and the Chinese patent and found they disclose the same invention, their claims differ in only insubstantial ways and disclosure the same set of figures. As explained in paragraph 32, the patent at issue in the German proceeding is that patent to which the '659 Patent claims priority and discloses only insubstantial differences in the drawings and figures.

The Federal Circuit recently discussed the use of reference numerals in drawings to interpret claims. In *Ironworks Patents LLC v. Samsung Elecs. Co.*, 2020 U.S. App. LEXIS 5269 (Fed. Cir. February 21, 2020) (Exhibit R), the '078 Patent required a "camera unit" that is part of the device. The district court interpreted "camera unit" as requiring "a camera, optics, microprocessor and memory, battery, and interface to

external systems" all situated as a component of a personal communication device. *Id*. at 2. On appeal, the Federal Circuit explained that the camera unit in the specification is consistently numbered in the fourteens (14, 14a, 14b, 14o, 14c). *Id*. at 7. The battery and interface have separate numbers — indicating that they are not actually part of the camera unit. *Id*. at 8. Figure 5 uses the same numbering convention as the rest of the specification, suggesting camera unit 14 is comprised of elements numbered as 14 (i.e., camera arrangement 14o, which comprises camera 14a and optics 14b, and image processing unit 14c). *Id*. Other elements in Figure 5 are numbered differently, such as battery 21 and interface 22, suggesting they are not part of the camera unit 14. *Id*.

Here, both proceeding applied an almost identical analysis of whether a person skilled in the art would have motivation to combine the relevant prior art. For example, in the China proceeding, the decision stated:

- "If the differences between claims and the closest prior art are that the applications are different but the structures are similar and the applications in the art can be interchanged with each other without essential change in structure, one skilled in the art can obtain the features in the claims without inventive action based on the foundation of the prior art, and the claims do not involve an inventive step." (Exhibit G, p. 2).

- "when one skilled in the art faces to the design of the guide rail of a curtain in a motor vehicle, he/she has a motivation to search for technical suggestion in the field of curtain rails for a window of a motor vehicle and has an ability to adjust the structures based on the actual assembling parts..." (*Id*., p. 11).

- "one skilled in the art would easily think of a similar design to a guide device of a curtain to form an undercut guiding groove by two grooves free of undercuts." (*Id.*, p. 10).

Examples from the German proceeding include the following:

- "taking into account the knowledge of a person skilled in the art" (Exhibit H, p. 14).

- "the guide rail arrangement claimed in the present case results for the skilled person in any case in an obvious way from publication K4, taking into account his knowledge, as documented by K10 and K12" (*Id.*, p. 18)

- "[f]or the relevant expert, however, it is obvious that a guide rail with at least a complex external shape" (*Id.*, p. 19).

Below are the Asserted claims with reference to the proceeding and prior art used relative to each claim limitation. Claim 22 states as follows:

A guide rail arrangement (16) for window shades (14) in motor vehicles[5] comprising an [sic] first part (63) in the form of an elongated molded part[6], said first part (63) including a first connecting portion (68) and an elongated section formed with a groove that is essentially free of undercuts and extends continuously over at least a part of the length of the guide rail arrangement[7], a second part (64) in the form of an elongated molded part[8], said second part (64) having a second connecting portion (71) and an elongated section formed with a groove that is essentially free of undercuts and extends continuously over at least a part of the length of said guide rail arrangement[9] (16); and said connecting parts (68, 71) of said first and second parts (63, 64) being interconnectable to position and retain the first and second parts (63,

---

[5] Proceeding: German; Prior Art: EP 1215063 same patent family as US Publication No. 2002/0074824 A1 ("Schlecht").
[6] Proceeding: China; Prior Art: JP Patent Publication No. 6-61293B2 ("JP")
[7] *Id.*
[8] *Id.*
[9] *Id.*

64) relative to one another[10] with said grooves of said first and second parts (63, 64) defining an undercut guide groove[11]. [Exhibit A].

Claim 23 and 24 state "The guide rail arrangement of claim 22 in which one of the first and second connecting portions is in the form of a web," and "[t]he guiderail arrangement of claim 23 in which one of said first and second connecting portions includes a groove."[12] Claim 29 states "The guiderail arrangement of claim 24 in which one of said first and second parts is made of thermoplastic material."[13] Claim 32 states " The guiderail arrangement of claim 22 in which one of said first and second parts forms an integral component of a section of an inside lining of a motor vehicle."[14]

Claim 37 states as follows:

A window shade (14) for motor vehicles comprising a rotatably supported window shade shaft (19), a strip-shaped shade (15) having one edge fixed to said window shade shaft (19), a guide (23, 24) connected to an edge (22) of the window shade strip (15) distant from said window shade shaft (19), at least one guide rail (16) for receiving and guiding one end of said window shade guide (23, 24) for relative movement[15], and said guide rail (16)  including a first part (63) in the form of an elongated molded part having a first connecting portion (68) and an elongated section formed with a groove that is essentially free of undercuts and extends continuously over at least a part of the length of said guide rail arrangement[16], a second part (64) in the form of an elongated molded part that includes a second connecting portion (71)

---

[10] Proceeding: German; Prior Art: "Plastic Product Design", Ronald D. Beck, 2nd Edition ("Beck"); Proceeding: China; Prior Art: JP

[11] Proceeding: China; Prior Art: JP Patent Publication No. 6-61293B2 ("JP")

[12] Proceeding: China; Prior Art: EP0948922A2 ("EP09") in combination with JP

[13] Proceeding: China; Prior Art: JP

[14] Proceeding: German; Prior Art: Schlecht

[15] *Id.*

[16] Proceeding: China; Prior Art: JP

and a [sic] elongated section formed with a groove that is essentially free of undercuts and extends continuously over at least a part of the length of the guide rail arrangement[17], and said connecting portions (68, 71) of said first and second parts (63, 64) being interconnectable to hold the longitudinal sections of the first and second parts (63, 64) together[18] such that the grooves therein forming a guide groove (27) for said window shade guide (23, 24).[19] [*Id.*].

Claim 38 states "The guide rail arrangement of claim 37 in which one of said first and second connecting portions is in the form of a web and in which one of said first and second connecting portions includes a groove."[20] Claim 42 states "The guide rail arrangement of claim 37 in which one of said first and second parts forms an integral component of a section of an inside lining of a motor vehicle."[21]

## <u>CONCLUSION</u>

WHEREFORE, Defendants pray that this Honorable Court grants Defendants' motion for summary judgment for the reasons stated herein.

CARDELLI LANFEAR, P.C.

By: /s/ Jason T. Newman
    Jason T. Newman (P72571)
    CARDELLI LANFEAR, P.C.
    Attorney for Defendants
    322 W. Lincoln, Royal Oak, MI 48067
    (248) 544-1100
Dated: April 3, 2020    jnewman@cardellilaw.com

---

[17] *Id.*
[18] Proceeding: German; Prior Art: "Plastic Product Design", Ronald D. Beck, 2nd Edition ("Beck"); Proceeding: China; Prior Art: JP
[19] *Id.*
[20] Proceeding: China; Prior Art: EP0948922A2 ("EP09") in combination with JP
[21] Proceeding: German; Prior Art: Schlecht

## __INDEX OF EXHIBITS__

Exhibit A – US Patent 7,188,659

Exhibit B – Report of Dr. Malloy with Exhibits A and G, only

Exhibit C – Drawings: Macauto 000000313

Exhibit D – Malloy Dep

Exhibit E - Schlecht

Exhibit F – Parker Dep

Exhibit G – China Proceeding with translation

Exhibit H – German Proceeding with translation

Exhibit I – China Patent with translation

Exhibit J – Report of J. Leone

Exhibit K – Leone Dep

Exhibit L – German Patent with translation

Exhibit M – Affidavit of R. Hsiao

Exhibit N – EP1215063 with translation

Exhibit O – JPH0661293B2 with translation

Exhibit P - Beck

Exhibit Q – EP0948922A2 with translation

Exhibit R - *Ironworks Patents LLC v. Samsung Elecs. Co*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of Defendants' Motion for Summary Judgment, and this Proof of Service were served upon counsel of record via the court's electronic filing system on April 3, 2020.

I declare under the penalty of perjury that the statement above is true to the best of my information, knowledge and belief.

/s/ Jason T. Newman